**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **PAMELA PHILLIPS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:10-cv-610-WTL-TAB** |
| | ) | |
| **VASIL MANAGEMENT** | ) | |
| **COMPANY, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendants' motion for summary judgment. The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

**I. STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not

required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. <u>FACTUAL BACKGROUND</u>

The Defendant College Park Apartments, LLC, owns an apartment complex in Indianapolis, Indiana, known as College Park Apartments. Mike Surak owns College Park Apartments, LLC. The Defendant Vasil Management Company, Inc., doing business as Village Management Company, manages College Park Apartments.

Loretta Martin ("Martin") was formerly the property manager at College Park Apartments, where she was on friendly terms with tenant Pamela Phillips, an African-American female who worked as a floral designer. In October 2007, when Martin accepted the position of regional manager with Village Management, she asked Phillips to consider being the property manager of College Park Apartments. Phillips told Martin that she was not experienced in property management and that she thought she would not be good at it, but Martin encouraged her to apply for the position.

Martin interviewed Phillips for the position, and Phillips was hired in October or November 2007. Phillips was then supposed to undergo training according to the Defendants' typical training plan:

> New Site Managers are trained on-site during the first week of hire. Managers are trained on the following subjects: Rent collection, delinquency notices, maintenance issues, collection of paperwork from potential new Tenants, completing move-in packets with new Tenants, and submitting paperwork and reports to corporate office. . . . Approximately three weeks later, the manager travels to Village Management Company's corporate office for additional training or re-training as needed. Site Managers are also required to attend Manager Meetings which are held each year at varied locations.

2

Martin spent three or four days with Phillips after she was hired, but she did not walk Phillips through her first lease signing. Phillips also was not trained on paperwork or evictions. On the second day of Phillips' employment, Phillips went to the main office with Martin. Martin instructed Phillips to sit and wait while she made phone calls and performed her own work because, according to Martin, the work was nothing Phillips needed to know how to do. Over the course of Phillips' employment, Martin told Phillips, "There's so much more training, but I don't have time, and I will get back to you," and "I need this certain paperwork, and I know I haven't gone over that with you, and I apologize. . . . I promise you I will get to you and make sure we get the full training done."

After Phillips leased an apartment to an African-American tenant, Martin told Phillips not to sign any more African-Americans because "they tend to run down the property," and as an African-American manager, Phillips would be accused of "ruining [Surak's] baby as far as College Park." Martin told Phillips that the home office would blame her and find her "at fault of the property going down." Martin also told Phillips that African-American women were "loud" and "dirty."

## A. Phillips' Relationship with Martin

On the first day of Phillips' employment, she went to the College Park Management office to meet with Martin. When she arrived, Phillips found Martin and another tenant, David Brown, waiting for her. Martin introduced the two, but Phillips became uncomfortable because Brown was sitting and smiling at her, so she excused herself and went to the restroom. Phillips stayed in the restroom until Brown left, and then she went back to meet Martin, who informed

3

her that Brown had wanted to meet her. Phillips believes that Martin was trying to set her up with Brown.

On two other occasions, Martin asked whether Phillips would be interested in dating a maintenance worker at another apartment complex, Mark Jenkins. On both occasions, Phillips told Martin that she was not interested. Martin may have made other matchmaking attempts, but Phillips ignored them.[1] Martin continued to ask Phillips about her dating life, so Phillips told her that she was dating a friend, Darryl, "just to shut her up about the matchmaking." When Phillips told Martin about Darryl, Martin "kind of stopped . . . being so pushy about the matchmaking thing."

Phillips talked to Martin's boss about Martin's attempts at matchmaking, but when she did this is unclear. Phillips also told Martin that she thought her matchmaking attempts were unprofessional. Phillips said that she "sensed an attitude" after she rejected Martin's offers, and she wondered whether Martin would terminate her employment because she did not "play her game," but Martin never explicitly conditioned Phillips' employment on her acceptance of these matches.

### B. Phillips' Relationship with Marcelino Rodriguez

After receiving approval from Martin, Phillips hired Marcelino Rodriguez as a maintenance person for College Park Apartments. At first, according to Phillips, Rodriguez "was

---

[1] It is unclear whether Martin made any other matchmaking attempts. At one point in her deposition, Phillips replies "As far as I know, that was it" to counsel's question about any other people Martin attempted to match with Phillips, but later responds to the same question, saying "I'm sure there was quite a few people, but I didn't pay it any mind."

just the kindest person, and he would do everything just right," but in early October 2008, problems developed.

On October 7, 2008, College Park Management entered the following note in a daily notebook:

> Spoke with Marcelino (CPA) re: situation between Pam Phillips & [Martin]. Feels he is being put in the middle and doesn't like it. I assured him he is to speak to Pam only about maint. issues & nothing else. Advised Mary of situation & agreed.[2]

After the October 7th meeting, Phillips noted a significant shift in her working relationship with Rodriguez. She explained that after Rodriguez met with management, "everything was just different with him. I felt like he lost respect for me, because he was just the kindest person, and he would do everything just right. But ever since, you know, those times when [Banks] would call for him, he just acted totally different."[3]

On October 7, after this meeting with management, Rodriguez tried unsuccessfully to contact Phillips by phone, and he eventually went to her apartment. After Phillips' son answered the door, Rodriguez insisted on speaking with Phillips. Phillips, who was wearing shorts and a shirt, covered herself with a blanket and answered the door. When Phillips came to the door, Rodriguez asked her whether she was wearing anything under the blanket. Phillips thought this comment was inappropriate, especially given that her children were standing within earshot.

---

[2] The record provides little detail about the "situation" between Phillips and Martin.

[3] Language in Phillips' deposition testimony suggests that there may have been more than one meeting between management and Rodriguez; however, only the date of the October 7, 2008, meeting is confirmed by the evidence.

According to Phillips, "[Rodriguez] was just acting really weird after coming from the corporate office." It was also around this time that Rodriguez repeatedly asked Phillips to marry him and invited her children to meet his family. It is unclear whether Rodriguez asked Phillips to marry him on October 7 at her apartment, or if he asked her to marry him on October 6 at the College Park office.[4]

The day after Rodriguez asked Phillips to marry him, Rodriguez failed to report to work. Some of the College Park tenants were without water utility service that day, and Martin instructed Phillips to find Rodriguez, who was needed to work on the problem. Phillips went to Rodriguez's apartment and found the door partially open. Phillips knocked but did not enter Rodriguez's apartment; instead, she stood outside and called his work cell phone. Another tenant, Sandy Wilson, came out into the hall to investigate, and she informed Phillips that she thought Rodriguez was inside, so Phillips "peeked" inside and saw Rodriguez lying on the floor. While it was dark, Phillips said she thought it looked like Rodriguez was not wearing any clothes, and Wilson confirmed this. On seeing Rodriguez on the floor, Phillips ran back to the office and called 911, and an ambulance came to the apartment complex.

Banks and Martin then came to College Park to investigate the incident and Phillips told them about Rodriguez's advances. Phillips had tried unsuccessfully to tell Banks and Martin

---

[4] In her deposition testimony, Phillips explains that "[Rodriguez] asked me the day before that day [the day he asked her whether she was naked under the blanket] in the office." But, in response to the next question about how many occasions Rodriguez asked her to marry him, Phillips replies that it was "[j]ust that day he was just acting really weird after coming from the corporate office, and he just kept asking that same question over and over." Phillips' statement to the EEOC about the blanket comment does not mention that Rodriguez asked her to marry him, so it may also be that Rodriguez asked her to marry him only on October 6 and not October 7. Regardless, what is significant here is that these events took place over the span of just a few days, and culminated in Rodriguez's resignation on October 9, 2008.

about Rodriguez's unwelcome marriage proposals before the ambulance incident.[5] Phillips may have also told another management-level College Park employee about Rodriguez's proposals before the ambulance incident.[6]

Banks and Martin interviewed Rodriguez about his behavior toward Phillips on October 9, 2008. Although Rodriguez denied all of Phillips' allegations, he was upset because he believed that Phillips had entered his apartment and seen him naked. At the end of the meeting, Rodriguez stated that he could not work with Phillips and tendered his resignation. Although Banks and Martin decided that Phillips' sexual harassment claim was a "he said-she said" issue, Banks accepted Rodriguez's resignation due to other problems with his job performance. Although Rodriguez came back the next day and asked for his job back, Banks refused.

In addition to the above incidents, Rodriguez once attempted to brush hair away from Phillips' face, but when she rebuffed him, he did not touch her. Phillips testified that the EEOC characterized this action as a sexual advance, but that while she found it "uncomfortable," she did not find it inappropriate or sexual.

---

[5] It is again unclear the timing of these events as Phillips' deposition testimony contradicts itself. At one point Phillips agrees to the following timeline of events: first, she tried to tell Banks and Martin about Rodriguez's weird behavior, but Banks and Martin did not respond; the next day Rodriguez asked her to marry him; the day after that, she found him lying naked on his apartment floor. Yet elsewhere, Phillips states that the instances when she tried to tell management about the marriage proposal were "when I tried to call them and they wouldn't respond to my emails, phone calls or fax."

[6] Phillips explained that she told Cheryl Moody about the marriage proposal before the ambulance incident, "because that was the day of the training, the so-called training," and that Moody advised her to "get rid of him." Yet in Phillips' response to the instant motion, she states that the "first and only" training she ever received from Cheryl Moody occurred on October 21, 2008, twelve days after Rodriguez's resignation.

### C. Phillips' Work Performance

During her employment, Phillips was admonished to correct her work performance and later received written warnings about her performance, but Martin also told her many times that she was doing a good job.

On December 28, 2007, Martin sent an email to Phillips reprimanding her for failing to collect rent from a tenant and for having too many delinquent rental payments.

On June 19, 2008, Martin sent Phillips an email reprimanding her for using Village Management's Lowe's account without permission.

On September 3, 2008, Martin sent an email to Phillips reprimanding her for forgetting to include a deposit slip with the tenant check deposits. Martin admonished Phillips to "clear you[r] mind and double check your work before it comes to the office."

On September 4, 2008, Martin sent another email to Phillips asking her to check her work before sending it to the corporate office.

On September 22, 2008, Martin provided Phillips with a verbal warning for approving overtime for maintenance personnel without authorization.

In October 2008, Phillips began reporting to Jenny Banks, the Vice President of Operations of Village Management. Termination of Pam Phillips' employment was also considered in early October. On October 2, 2008, a note was entered in an employee daily status notebook:

> Human Resources – Spoke with Jeff [illegible] of [illegible] & Therman re: Pam Phillips termination. She could retaliate due to assault injury. Some risk to terminate w/o proper warnings in file. Suggested if no warnings in file prior to assault to sit down w/her & layout what your concerns are (performance, attitude, cooperation) and what she needs to do to improve with a set time limit.

8

Martin noted Phillips' September 22 warning on an employee warning report and faxed it to Phillips on October 2, 2008. In response, Phillips provided an employee statement that "due to everything thats going on this dose not suprise me [sic]" and accused Martin of "covering [her] butt as usual."

Martin then conducted an evaluation of College Park Apartments, but she did not tell Phillips about the evaluation in advance or share the evaluation report with her. While Phillips did sweep the floors and wipe down the bathroom every other day, Martin noted on the evaluation form that Phillips' office had an "unprofessional appearance," was "cluttered," and there were "stacks of papers on the desks and shelves." Martin observed that tenant files had "loose papers in them" and renewal leases were not signed or were signed late. However, Martin had earlier told Phillips, "This is your office, you can do whatever."

On November 13, 2008, Banks provided Phillips with a "Second Warning Notice" that listed in detail three separate incidents forming the basis for the warning. Specifically, Banks noted that (1) there was no working spare key in the office key box for showing units and attending to maintenance issues; (2) Phillips had not yet obtained a security deposit from Rodriguez; and (3) Phillips allegedly gave her approval for Rodriguez to keep all sets of keys to his apartment. The notice noted that Phillips had received a previous warning on September 22, 2008, and warned that the next violation would result in termination. Phillips refused to sign the notice "because the statemen [sic] attached are lies."

On January 20, 2009, Banks presented Phillips with an email listing questions she had about rent and paperwork for various tenants and applicants. The email purported to have been sent on November 12, 2008, but Phillips had not received it. Phillips answered Banks' questions,

but Banks asked for her resignation, telling her "if you walk out right now, I won't fight unemployment."

On January 22, 2009, Banks informed Phillips that her performance had not improved satisfactorily, and based on previous discussions and warnings, her employment was being terminated. The Termination Report listed the reason for Phillips' termination as "performance" and rated her initiative and management skills as "unsatisfactory."

On April 15, 2009, Phillips filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging discrimination based on race, sex, and disability.[7] She included a statement that detailed the incidents with Rodriguez on October 7, 2008. On March 23, 2010, the EEOC issued a Dismissal and Notice of Rights, finding that "[b]ased on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." Phillips then filed the instant suit pursuant to Title VII, alleging that the Defendants terminated her employment because of her race and gender. She also alleges that she was subjected to sexual harassment and that her employment was terminated when she complained about that harassment.

### III. DISCUSSION

Title VII makes it unlawful for an employer to discriminate against an individual with respect to that person's hiring, discharge, or employment conditions because of that person's race or sex. 42 U.S.C. § 2000e-2(1). Liability attaches to an employer for the actions of its agents constituting discrimination proscribed by Title VII. 42 U.S.C. § 2000e(b).

A plaintiff may prove unlawful employment practices directly or indirectly. "To avoid

---

[7] Phillips no longer claims discrimination based on disability.

summary judgment under the direct approach, the plaintiff must produce sufficient evidence . . . to create a triable question of intentional discrimination in the employer's decision." *Silverman v. Board of Educ. of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011).

The plaintiff proceeds under the direct method by proving the practice by either direct or indirect evidence. Direct evidence under the direct method proves the decision maker's discriminatory intent without reliance on inference or presumption. *Id.* at 734. It amounts to an acknowledgment of discriminatory intent by the decision maker. *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (explaining that employers are unlikely to be caught making statements that directly evidence discrimination, such as "I fired Judy because she was an old woman"). "When a plaintiff proceeds under the direct proof method, allegedly discriminatory statements are relevant . . . only if they are both made by a decisionmaker and related to the employment decision at issue." *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 688 (7th Cir. 1998)."To be probative of discrimination, isolated comments must be contemporaneous with the [the adverse action] or causally related to the [applicable] decision making process." *Geier v. Medtronic Inc.*, 99 F.3d 238, 242 (7th Cir. 1996).

Indirect or circumstantial evidence relies on inference to create a "convincing mosaic" of evidence indicating intentional discrimination by the decision maker. *Silverman*, 637 F.3d at 734.

### A. Sex Discrimination Claim

Phillips relies entirely on the use of direct evidence under the direct method and explains that she "refrains from utilizing the indirect method" for her sex discrimination claim. She argues that the Defendants' discriminatory intent is clear from one statement – Martin's

comment that African-American women are "loud" and "dirty."[8] Assuming for the sake of this inquiry that Martin is the relevant decision maker, Phillips nevertheless fails in her claim because she does not show how this statement is related to any employment decision and she produces no evidence relative to the statement's timing. For this reason, the Defendant's motion for summary judgment as to Phillips' sex discrimination claim is **GRANTED**.

### B. Race Discrimination Claim

Phillips argues that she was subjected to discriminatory animus and disparate treatment that creates a convincing mosaic of circumstantial evidence of race discrimination under the direct proof method.

Circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). "Convincing mosaic" analysis utilizes three broad types of circumstantial evidence: (1) "suspicious timing, ambiguous statements [sic] oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematic better treatment of similarly situated employees who are not members of the protected class; and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The evidence of pretext is substantially the same as that required under the indirect method of proof. *Huff v. UARCO, Inc.*, 122 F.3d 374,

---

[8] Phillips argues that Martin made "other negative comments," but fails to support this assertion with any detail.

380 (7th Cir. 1997). Phillips cites evidence in each of the categories to create her convincing mosaic.

Phillips cites two statements made by Martin as evidence of Martin's and the Defendants' discriminatory intents. Specifically, Martin told Phillips not to rent to African-Americans because "they tend to run down the property, and [you will] be accused, as being a black manager, of, you know, ruining [Surak's] baby . . . . [T]he home office would blame you. You would be at fault of the property going down or whatever." Martin also told Phillips that African-Americans are "loud" and "dirty."

Phillips asserts that she was subjected to disparate treatment because she was not reimbursed for mileage and office expenses while other property managers were reimbursed and she was not trained as well as other property managers. Martin told Phillips not to turn in her expenses to save the company money because Surak would "have a fit," so Phillips simply bought office supplies with her own money and did not turn in expense reimbursement requests. Phillips states that "all the other property managers that worked for Village Management" were reimbursed, a fact that she apparently extrapolates from the Defendant's "policy" of reimbursing its employees.

While the Defendants argue that Phillips received more training than other property managers under Martin's supervision, Phillips argues that her training was nonetheless deficient in quality and she is "sure [other property managers' training] was more thorough" than her training. While Martin trained Phillips for the first three or four days of her employment, Martin did not walk Phillips through her first lease signing, and Phillips was not trained on paperwork and evictions. Martin admitted to Phillips that she had not yet been fully trained and she did not

13

train Phillips when she visited the corporate office on the second day of her employment.

Phillips relies on statistical evidence to prove that other non–African-American property managers were treated better in that they were properly trained. Between January 1, 2006, and November 30, 2010, the Defendants employed 101 different property managers. Of those, three were African-Americans, meaning that 97% of the Defendants' employees were not in Phillips' racial class. From this, Phillips argues that "[t]aking the Defendants' word at face value, the other property managers employed by the Defendant received training far superior to that which Phillips received. Thus, Defendants statistically afford better training to their White property managers when compared to their African-American property managers."[9]

According to Phillips, the Defendants have also exhibited behavior that can be characterized as "suspicious timing." After the Defendants' note indicating that they were considering Phillips' termination, Phillips began to notice significant changes in how the Defendants treated her, as she received written warnings for violations of policies on which she had not been trained and her office was subjected to a "secret" evaluation.

Phillips also argues that the Defendants' reasons for terminating her are pretextual. In support of this assertion, she contends that the Defendants have engaged in "secretive behavior and shifting explanations." The Defendants' secretive behavior, so Phillips argues, consists of (1) not giving her an opportunity to correct her performance; (2) conducting a "secret" evaluation of her office and not permitting her to review it before her termination; and (3) using an email she did not receive as part of the basis for her termination. The Defendants' shifting

---

[9] The Defendants never clarify what the "Defendants' word" being taken at face value actually is. For purposes of this analysis, the Court assumes that it is Defendants' description of its typical training plan provided in response to Phillips' interrogatories.

explanations consist of using Martin's "secret" evaluation that the office was cluttered as a basis for her termination, when Martin had earlier told Phillips that "the office was hers to organize and run the way she wanted" and "Phillips testified that she kept the office tidy."[10]

Finally, Phillips contends that her claim of racial discrimination is supported by the fact that she was replaced by a white woman.

Phillips' strained attempt at creating a mosaic falls far short of convincing as her "tiles" are too few and too weak. Assuming that Martin's statements are relevant because she provided input into the decision to terminate Phillips, Phillips does not explain when these statements took place, and as such has made no showing that these statements were causally related to her termination. Phillips has also failed to cast a shadow of suspicion on the Defendants' timing; the Defendants' use of written warnings after October 2008 is entirely consistent with their attorney's advice to begin documenting discipline in support of her termination. Phillips' argument that she was treated differently relies entirely on statistics and generalizations that do not support the inference she desires – policy differs from practice, and the mere fact that the Defendants endeavor to reimburse and train their managers according to a certain policy does not establish that they routinely – or indeed ever – actually did so. Nor has Phillips shown that the Defendants' reasons for her termination are pretext, as none of her evidence creates the inference

---

[10] Counsel also argues that pretext is apparent in the fact that Phillips was told the reason for her termination was because 911 had been called to the property too many times, but the Defendants never again gave this reason as a basis for her termination. However, a close reading of Phillips' deposition reveals that while Martin told Phillips that 911 had been called on the property too many times, Phillips never testified, explicitly or by implication, that Martin told her that this was the basis for her termination, and it is unclear whether Martin was even present when Phillips was officially terminated. The Defendants' Termination Report lists the reason for Phillips' termination as "performance" and rates her initiative and management skills as "unsatisfactory."

that the Defendants have lied. Finally, Phillips may have been replaced by a white woman, but she has made no showing that she was qualified for the position in the first place.[11] Cobbled together, these "tiles" do not create a convincing mosaic from which an inference of intentional discrimination can be drawn. The Defendants' motion for summary judgment as to Phillips' race discrimination claim is therefore **GRANTED**.

### C. Sexual Harassment Claim

"Title VII's prohibition against discrimination in employment on the basis of sex encompasses sexual harassment that is sufficiently severe or pervasive to alter the employee's terms or conditions of employment." *Bernier v. Morningstar, Inc.*, 495 F.3d 369 (7th Cir. 2007). In order to establish a prima facie case of sexual harassment under Title VII, the plaintiff must demonstrate that: "(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on [the individual's] sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002).

In determining whether a work environment is hostile, the Court is mindful that Title VII "comes into play before the harassing conduct leads to a nervous breakdown." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 22 (1993). The Court considers "the frequency of the discriminatory

---

[11] In fact, there is evidence in the record that Phillips thought she did not have the experience needed for the position, but Martin encouraged her to take the job. Phillips also testified that she had a learning disability and her son would correct her email messages.

16

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The threshold question is any case is whether the conduct alleged by the plaintiff "rise[s] to a level of 'hostility' offensive enough to be considered actionable." *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (7th Cir. 1986). Phillips argues that the conduct of her supervisor, Loretta Martin, and a College Park Apartments maintenance worker, Marcelino Rodriguez, rises to this level.

### 1. Loretta Martin

Phillips argues that she was subjected to a hostile working environment created by her supervisor's "unwelcome verbal conduct of a sexual nature," which consisted of at least three attempts to set Phillips up on dates.

The scant evidence Phillips sets forth in support of her claim does not rise to the level of a hostile working environment. Phillips testified to three definite instances of matchmaking attempts by Martin over the course of her roughly 16 months of employment, but she does not show that these attempts by themselves were severe or pervasive. Phillips describes her discomfort and "shock" that Martin would ask about her personal life, but she also testified that Martin "kind of stopped" attempting to match her when she told Martin that she was dating her friend Darryl.

Bishop does not make any showing about the frequency or manner of Martin's other attempts, other than to say that "I'm sure there was quite a few people." But speculation at the summary judgment stage is not enough. Phillips states that she was shocked, but then is unable to name any matchmaking attempts because she was able to ignore them.

Furthermore, Phillips has not described conduct that was physically threatening or humiliating, nor has she alluded to any decrease in her ability to perform her job. At most, Phillips has produced minimal evidence showing that Martin's attempts may have been unexpected and made her uncomfortable, but she has not put forth any evidence to show that her working environment was so hostile as to effectively alter the terms of her employment.

### 2. Marcelino Rodriguez

Phillips argues that her work environment was rendered hostile by Rodriguez's conduct, specifically when he once attempted to brush hair from her face, asked her to marry him, and asked her whether she was wearing anything under a blanket. The Court disagrees.

Phillips again has not shown conduct that was so severe and pervasive as to alter the terms of her employment. The time frame in which these acts occurred – three or four days, ending with Rodriguez's termination –is too short to qualify as pervasive. Before that time, Phillips characterized Rodriguez as "just the kindest person." The conduct can not be fairly characterized as severe. While Rodriguez's insistence on talking to Phillips at her apartment was certainly physically confrontational, Phillips stated only that she was "upset," and she has produced no evidence that she was intimidated or humiliated. Finally, Phillips has produced no evidence to show that her work performance was affected in any way.

Like Martin's matchmaking attempts, Rodriguez's mild overtures in the span of just a few days and ending with his resignation, while certainly strange and irritating, do not rise to the level of "hostility" offensive enough to be actionable under Title VII. Accordingly, the

Defendants' motion for summary judgment as to Phillips' claims for sexual harassment is

**GRANTED**.[7]

### D. Retaliation Claim

Phillips argues that her termination was retaliation for making a complaint about sexual

harassment by Rodriguez.

A Title VII plaintiff may bring only those claims that (1) were included in [her] EEOC

charge, or (2) are "like or reasonably related to the allegations of the charge and growing out of

such allegations." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir.

2010). The purpose of this requirement is to give employers warning of the claims brought

against them and to permit the agency and employer to resolve the claims without resort to the

courts. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). Courts should analyze

EEOC claims with care before dismissing a complaint as encompassing charges not within the

scope of the EEOC complaint, and the standard is that of "utmost liberality," a standard

necessary to "effectuate the remedial purposes of Title VII, which itself depends on lay persons,

often unschooled, to enforce its provisions." *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864-66

(7th Cir. 1985).

A plaintiff may include a claim in her EEOC charge by checking the appropriate box on

the form, but a court will also look to the underlying factual statements in the charge to

determine its scope. *See Babrocky*, 773 F.2d at 866 ("An EEOC complaint contains factual

statements only, which may implicate several different types of illegal discrimination."); *Jenkins*

*v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 168-69 (7th Cir. 1976) (discussing cases in

---

[7] Because the Court decides the hostile environment issue in the Defendants' favor, it
need not reach the employer liability issue.

19

which the court looked to the underlying factual statements); *E.E.O.C. v. World's Finest Chocolate, Inc.*, 701 F. Supp. 637, 640 (N.D. Ill. 1988) (looking to the "factual narrative of the charge" to find that the plaintiff included sex discrimination in her EEOC charge).

The court may look outside the four corners of the EEOC charge form and consider additional factual allegations submitted with the charge "when it is clear that the charging party intended the agency to investigate the allegations." *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000) (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110-11 (7th Cir. 1992) (considering the plaintiff's "Affidavit" submitted the same day as the charge)).

Phillips claims that she included her retaliation claim in her EEOC complaint when she submitted with the EEOC form a statement containing the following language:

> I feel that ever since the issues with upper management involving the property, that [Rodriguez] had lost total respect for me with all the issues that's going on here at College Park Apt. I was also told that I will be called back to talk with upper management. Never happened, however [Rodriguez] told me that upper management wanted him at the office to talk to him. . . . [Rodriguez] did come back upset saying that we were both going to get fired and that the upper management was really angry at me and is really after me.

In reviewing this statement, the Court is reminded that "technicalities are particularly inappropriate" in a scheme that relies on lay persons to initiate the process, but notes that "the requirement of some specificity in a charge is not a 'mere technicality,'" as some detail is necessary to permit the EEOC to perform its investigation. *Rush*, 966 F.2d at 1111. Phillips' statement lacks the detail necessary to clearly indicate a retaliation claim; in fact, absent counsel's gloss, Phillips' statement lacks even a hint of retaliation. Contrary to Phillips' counsel's representation to the Court, there is no mention in this statement or the page preceding it of Phillips' complaint to management about sexual harassment, and the problems she explicitly

mentions are with "upper management," not Rodriguez.[8] In addition, there is no mention in

Phillips' statement that she was ultimately terminated. While Phillips indicates that she made a

complaint about sexual harassment, this statement occurs in her charge form. No additional

details accompany this statement in the charge form, which is certainly a logical place for such

an addition. As such, Phillips' charge form and statement can not fairly be read to include a

charge of retaliation.

Alternatively, Phillips argues that her retaliation claim is "like or reasonably related to

the allegations of the charge or the allegations growing out of the charge." While "[n]ormally

retaliation and discrimination charges are not considered 'like or reasonably related' to one

another," *Swearnigen-El*, 602 F.3d at 864-65, these claims may be like or reasonably related

when they are "intertwined in time, people, and substance." *Kristufek v. Hussmann Foodservice

Co.*, 985 F.2d 364, 368 (7th Cir. 1993); *see Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 726 (7th

Cir. 2003) (holding that a sex discrimination claim did not grow out of a retaliation claim where

the sex discrimination claim involved a "separate set of incidents, conduct and people").

However, Phillips has not argued that her retaliation claim falls outside the "normal" rule that

retaliation and discrimination charges are not like or reasonably related to one another. In

addition, the timing of Phillips' termination (more than three months after her complaint), the

distinct action taken (discharge), and the separate party involved in the termination decision

(Banks) place this case squarely with the purview of the norm.

---

[8] It is unclear from the context of the statement what the "issues with upper management" are. While counsel may argue that these "issues" are a sexual harassment complaint, the Court notes that this statement is dated October 7, which predates Phillips' report to Banks and Martin about sexual harassment. Other evidence in the record suggests that there was a separate ongoing conflict between Phillips and Martin.

For the foregoing reasons, the Court holds that Phillips did not include her retaliation claim in her EEOC charge, and she is therefore precluded from asserting her claim in this Court. The Defendants' motion for summary judgment with regard to Phillips' retaliation claim accordingly is **GRANTED**.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED** as to all claims in the Plaintiff's Complaint.

SO ORDERED:   1/20/12

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication